UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION


IN RE:

RONALD JOHN ROEDER                        Chapter 7
MARILYN ROEDER,

    Debtors.                          Bankruptcy No. 07-01422S

MONSANTO COMPANY and
MONSANTO TECHNOLOGY, LLC,

    Plaintiffs

vs.                                       Adversary No. 07-09189S

RONALD JOHN ROEDER,

    Defendant.


MEMORANDUM OF DECISION

The matter before the court is the final trial of a complaint to determine the dischargeability of debt for patent infringement under 11 U.S.C. § 523(a)(6).  Plaintiff Monsanto Company filed its complaint on November 9, 2007.  On January 8, 2009, the complaint was amended to add Monsanto Technology, LLC. On February 11, 2009, plaintiffs ("Monsanto") filed a motion for summary judgment.  In resistance, Roeder did not dispute the validity of Monsanto's patent and admitted that his conduct constituted patent infringement.  On April 1, 2009, the court granted the motion in part, ruling that Roeder's patent infringement was willful.  The matters left for trial were the issue of malicious injury and determination of damages.

Trial was held May 27, 2009 in Sioux City.  Appearing for Monsanto were attorneys Miles P. Clements, Joel E. Cape, Garrett

W. Thalgott, and A. Frank Baron.  Defendant Ronald John Roeder
was represented by attorney Donald H. Molstad.  This is a core
proceeding under 28 U.S.C. § 157(b)(2)(I).


<u>Findings of Fact</u>

Ronald Roeder, age 67, has been a farmer for most of his
life.  After graduating from high school, he worked at off-farm
jobs for seven or eight years.  Beginning in 1968, Roeder farmed
on his own, raising cattle and hogs and growing corn and
soybeans.  He farmed until 2006.

Roeder discontinued his cattle operation in the 1980s.  In
about 2000 he and his son expanded the hog operation.  They
raised hogs on two sites and increased their hog numbers to
16,000 head.  It was at about this time that Roeder began to have
financial problems.  His farm operation was over-extended.
Roeder explained that hog prices went down, and his feed costs
were locked in at an unfavorable price.

From the 2001 crop year through 2005, Roeder farmed a number
of parcels of land, planting primarily popcorn and soybeans in
rotation.  For several years he raised popcorn under contract for
a certain price per pound.  For about seven years prior to 2003,
Roeder was a soybean seed producer for Remington Seeds in Harlan,
Iowa.  During those years, Roeder did not need to purchase
soybean seed because Remington furnished the seed.  Beginning
with the 2003 crop year, Roeder no longer raised contract bean
seeds.  He said that the business was not sufficiently profitable

and that increased trucking costs were a factor.

Farm Service Cooperative financed Roeder's crop production until 2003.  In March 2003, he obtained crop financing from Partners in Production, a Minneapolis firm.  The financing provided by Partners in Production was not enough to cover all his crop expenses.  Roeder said that his expense for rent of farm ground went up from $165.00 per acre in 2003 to $175.00 per acre in 2005.  He did not say how many acres he rented in each year.

From 1983 to 2006, Roeder was also a seed dealer for Wilson Seeds.  He was a seed dealer in 1996, the year that Monsanto introduced Roundup Ready® soybeans ("RR soybeans") commercially.

RR soybeans are protected by several United States patents. All RR soybeans contain the genetic biotechnology protected by Patent No. 5,352,605 (the "'605 patent").  The parties describe the technology briefly in the joint pretrial statement:

> By definition, Roundup Ready® soybeans contain a DNA construct consisting of a promoter DNA sequence which is the 35S Promoter from Cauliflower Mosaic Virus (CaMV), a chloroplast transit peptide coding sequence, a CP4 EPSPS coding sequence, and a NOS 3' nontranslated region, known collectively as the "CaMV 35S-CP4 Construct."  The CaMV 35S-CP4 Construct comprises the Roundup Ready® gene in soybeans.

Doc. 28 at 4.

As a seed dealer, Roeder sold RR soybeans to other farmers and prepared paperwork and invoices in connection with those sales.  Roeder knew that all sales of RR soybeans included a technology fee, either as a separate line item on the invoice or as part of the price of each bag of seed.  He knew that the technology fee was charged by Monsanto for a limited license to

3

use the patented RR soybean technology.   Roeder knew that sales

of RR soybeans required a farmer to sign a technology agreement.

He knew prior to 2003 that saving RR soybean seed and planting

saved seed were in violation of the agreement and an infringement

of Monsanto's patent.

In the spring of 2003, Roeder took RR soybeans from a bin

owned by his son, Terry, without permission.   He did not tell

Terry about taking the soybeans until much later.   Roeder planted

355 acres with the RR soybeans taken from Terry.   The parties

stipulated in their joint pretrial statement that Roeder's

average planting rate was 40 to 45 pounds of soybean seed per

acre.   Assuming an average planting rate of 42.5 lbs. per acre,[1]

Roeder planted the equivalent of 302 50-lb. bags of saved seed

(42.5 lbs./acre x 355 acres / 50 lbs./bag).

When Roeder harvested his 2003 crop, he saved seeds for

planting in the 2004 crop year.   Roeder planted 143.1 acres of

soybeans in 2004.   He made legitimate purchases of 23 bags of RR

soybeans and used the equivalent of 99 bags of saved seed to

plant the remaining soybean acres.

Roeder said that he purchased some bags of seed from a

client who had returned them to him as the seed dealer.   Exhibit

11 appears to be a copy of a check written by Roeder on February

22, 2004, payable to Steve Schug in the amount of $264.60.   The

memo line reads "10 bags seed beans."   Schug was not called as a

---

[1] Richard Wiig, identified below, testified that the current
average planting rate for soybeans in western Iowa is between 52
and 67 pounds per acre.

witness at trial.

In the 2005 crop year, Roeder planted 468.4 acres of
soybeans, which would have required 399 bags of seed. He made a
legitimate purchase of 160 bags of seed and would have required
the equivalent of 239 50-lb. bags of saved seed. The total
amount of saved seed used during the three crop years, therefore,
was the equivalent of 640 bags (302 + 99 + 239).

The price of a 50-lb. bag of RR soybean seed in 2003 was
$26.04. In 2004 and 2005, the price was $26.60 per bag.

During the years that Roeder planted saved seed, he
increased his total number of crop acres. In 2001 and 2002,
Roeder planted 346.3 acres of crops on four farms. FSA records
identify the farms by nos. 1518, 180, 4410, and 4598. Exhibits
1, 2. In 2003, he added farm no. 3558, an additional 153 acres.
Exhibit 3. In 2004, Roeder added another 115 acres with farm no.
5851. Exhibit 4. In 2004 and 2005, he planted 613.3 acres and
613.8 acres of crops, respectively.

RR soybeans are sold to individual farmers under a limited-
use license known as a Monsanto Technology/Stewardship Agreement
("technology agreement"). Every farmer who purchases a product
requiring a technology agreement is assigned an account number,
called a license number, that does not change from year to year.
The technology agreement contains a notice that RR soybeans are
protected by the '605 patent. On or about June 15, 2004, Roeder
signed a 2004 Monsanto technology agreement that included the
following provisions:

**Grower Agrees:**

- To use Seed containing Monsanto Technologies solely for planting a single commercial crop.

- Not to supply any Seed containing patented Monsanto Technologies to any other person or entity for planting.  Not to save any crop produced from this Seed for planting and not to supply Seed produced from this Seed to anyone for planting.
  . . .

- To acquire Seed containing these Monsanto Technologies only from a seed company with technology license(s) from Monsanto or from a licensed company's authorized dealer.

- To pay the Seed purchase price including any applicable technology fees.

Exhibit 22.  Monsanto's 2003 and 2005 technology agreements contained identical provisions relating to use for a single crop year, not saving seed and purchasing seed only from an authorized dealer.  The language regarding the agreement to pay the purchase price underwent slight changes from year to year.  In 2003, a farmer signing a Monsanto technology agreement would have agreed–

- To pay any applicable technology fees for cotton, canola, and sugarbeet traits <u>as well as the purchase price of corn and soybeans, which is in part a Monsanto royalty</u>.  (Some seed company licensees may continue to charge a technology fee to Growers on soybean Seed and corn Seed.)

Exhibit 16 (emphasis added).  In 2005, the language read:

- To pay the technology fees due to Monsanto that are a part of or collected with the Seed purchase price.

Exhibit 18.  The change in language reflects a change in the way RR soybeans were sold.  In earlier years, the technology fee charged by Monsanto was a separate line item on the invoice for seed purchases.  At some point, the technology fee was included

in the price of the bag of seed.  The fee caused a noticeable price differential between RR and conventional soybean seeds.

A major practical advantage of the RR soybean technology is that it allows a farmer to spray glyphosate herbicide over the top of growing crops.  Monsanto sells glyphosate herbicide under the trade name Roundup.  Glyphosate herbicide is non-selective. It kills at least 108 types of broadleaf weeds and grasses, but crops grown from RR soybeans are resistant to the herbicide.

During 2003, 2004 and 2005, Roeder practiced reduced tillage methods, which the parties referred to as "no-till" farming.  In each of these years, Roeder used glyphosate herbicide on all his soybean acres and sprayed it over the top of the crop.  Roeder did not take the saved soybeans to be cleaned commercially.

Richard Wiig is district seed sales manager for Midwest Seed Genetics in Carroll, Iowa.  The Midwest Seed Genetics entity evolved from the firm formerly known as Wilson Seeds.  From about 1985 to 1995, Wiig worked as manager of the Farm Service Cooperative in Irwin, Iowa.  His duties included advising farmers regarding seed application rates.  For approximately ten years, Wiig was a certified crop advisor.  In 1997, he was a district sales manager for Wilson Seeds.  Wiig first met Roeder when Wiig began working for Wilson Seeds.

Every bag of RR soybean seed sold in the United States, regardless of brand, is marked with a notice of Monsanto's '605 patent.  Bags of RR soybeans sold by Wilson Seeds contain a four-inch square label identifying them as "Roundup Ready™ Soybeans

for over the top application." The notice of patent covers an

area of approximately six inches by three inches and states:

> These seeds are covered under U.S. Patents 4,535,060,
> 4,940,835 and 5,352,605.  The purchase of these seeds
> convey[s] no license under said patents to use these
> seeds.  A license must first be obtained from Monsanto
> Company before these seeds can be used in any way.

Exhibit 13.

Wiig explained that the selling season for grain seed begins

in July or August with a kickoff meeting.  Sales contacts are

usually made through December.  Farmers prepaying for their

orders in December and January receive a discount.  Sales are

generally settled by June.  In each of the selling seasons 2002-

2003, 2003-2004 and 2004-2005, Roeder sold RR soybean seed.

At its kickoff meeting each year, Wilson Seeds provided

dealers with a dealer manual in a three-ring binder format.  The

information in the dealer packet included company policies,

descriptions of the programs and products for the year, and blank

copies of the technology agreement.  Dealers were instructed on

the licensing requirements for RR soybeans and how Monsanto's

technology fee was to appear on invoices.  When Monsanto changed

the technology fee from a separate line item to part of the price

per bag of seed, dealers were informed of the change.  In his

capacity as a dealer for Wilson Seeds, Roeder received copies of

the 2003, 2004 and 2005 technology agreements.

Wiig said that the use of RR soybeans promotes no-till

farming methods, because it allows the post-emergent use of

glyphosate herbicide.  No-till farming eliminates at least some

working of the soil and reduces the number of passes over the fields with heavy equipment.  The farmer saves time, wear and tear on equipment, and fuel costs.  Leaving crop residue on the land benefits the soil and reduces erosion.

Brian Kock is the bean location manager for Remington Seeds in Harlan, Iowa, and has worked with Roeder in the past.  Kock's work for Remington involves setting up contracts with farmers to grow soybean seed.  In the spring of each year he sends a contract document to each farmer with instructions for completing the form.  The document identifies the parties to the contract, lists the number of acres under contract, identifies the variety of soybeans that will be grown, and gives the legal description of the farm land.  A separate document is prepared for each variety to be grown.  The contracts with Remington do not allow the farmer to save soybeans of any variety.

If a contract is to produce RR soybeans, the document includes a "Monsanto Roundup Ready® Gene Agreement for Roundup Ready® Soybeans."  The cover page of the contract itemizes the Monsanto agreement as a document that requires the farmer's signature.  Remington's records show that Roeder grew RR soybeans under contract with Remington in the 2001 and 2002 crop years.  Remington has not retained records for earlier years.  The Monsanto Gene Agreement for 2002 provided in relevant part:

> These seeds are covered under U.S. Patents . . .
> 5,352,605 . . . .  Grower agrees that Company shall
> have the right to inspect and test the plants and grain
> in Grower's fields and grain or seed storage facilities
> during the year of production and the following year

> for the presence of Roundup Ready® soybean seed.
> Grower may not supply any of the parent seed to anyone
> else for planting, may not save any commercial seed
> produced for replanting, and may not supply saved
> commercial seed to anyone for replanting.

Exhibit 20, unnumbered page 8.  The Monsanto Gene Agreement also required the farmer to apply Roundup® herbicide, rather than generic glyphosate herbicide, at certain rates during certain growth stages of the crops.

Remington held grower meetings to discuss the details of performing a contract to produce RR soybean seed.  Meetings held in March addressed the completion of Remington and Monsanto contract documents.  When Remington signed up farmers to produce RR soybean seed, it required them to have a technology license number from Monsanto and to sign a Monsanto technology agreement.

Dion McBay, the United States marketing lead for Monsanto, identified features that make the use of glyphosate herbicide in conjunction with RR soybeans an efficient, cost-effective weed control system.  Prior to the development of RR soybeans, the primary post-emergent herbicides were the sulfonylurea and imidazolinone classes.  These herbicides were much more expensive than glyphosate, which had been used as a burn-down chemical.

Because glyphosate can be sprayed over the top of a RR soybean crop, the time of application is more flexible, allowing for weather conditions or other events.  McBay said that glyphosate has a shorter half-life and leaves less residue in the field, so it does not interfere with the rotation of crops.  It is a simpler and safer chemical to handle.

McBay said that better control of weeds, which compete with the soybean plants for moisture and nutrients, has resulted in higher yields for farmers.  In 1999 and later years, Monsanto used genetically improved varieties of soybeans for the RR soybean technology.  For the crop years 2003, 2004 and 2005, McBay stated that it would be not uncommon for RR soybeans to yield at least five to seven bushels per acre more than a conventional soybean crop.[2]  The court assumes this figure is a national average.

Dr. Timothy G. Taylor is a professor in the Food and Resource Economics Department and director of the Center for Agribusiness at the University of Florida.  He testified in support of Monsanto's request for reasonable royalty damages for Roeder's patent infringement by misuse of the RR soybean technology.  Post-trial, the court granted the parties' stipulated motion that Dr. Taylor's written report be admitted as Exhibit 25 and that the report be sealed (doc. 84).

Dr. Taylor based one calculation of a reasonable royalty on the hypothetical negotiation model discussed in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1121-22 (S.D.N.Y. 1970).  He applied this model using a split of net income above variable costs.  A second calculation was based on a

---

[2] In Monsanto Co. v. Strickland, 604 F.Supp.2d 805, 817 (D. S.C. 2009), the court stated that the Federal Circuit has acknowledged a 3 to 5 bushel-per-acre yield increase from RR soybeans.

benefits/ risk capture model.

Using the net income above variable costs approach, Dr. Taylor estimated Roeder's return per acre for each of the three years at issue. Dr. Taylor used information from the Iowa State University Extension to calculate crop input and harvest costs. For calculating gross receipts for each year, he used Iowa average market prices for the season and average yields for Ida County. The final calculation assumed, based on the parties' unequal bargaining power, that Monsanto would accept no less than 75 per cent of the net income in a hypothetical negotiation with Roeder. Dr. Taylor's estimates of a reasonable royalty using this approach ranged from $135 to $149 per acre.

Monsanto explained in its post-trial brief that the net-income-split approach should include the expense of any leased farm ground, but that Roeder did not supply that information (doc. 76 at 11).

The second approach used by Dr. Taylor quantified the value to Roeder of certain benefits assumed to result from planting RR soybeans rather than conventional soybeans, and the risk cost to Monsanto. Benefits and risks were expressed as a dollar amount per acre. Monsanto summarized this analysis in its post-trial brief. See id. at 11-13. Monsanto contends that the benefits/ risk capture approach is best suited to this case (id. at 11). Under this model, there is no hypothetically negotiated split of net income, but rather a transfer to Monsanto of the cost savings and benefits enjoyed by the farmer and a recapture of Monsanto's

cost to protect against the risk of infringement.

The benefits/risk capture approach has four components: seed cost savings from using saved seed; the value of higher yields that Monsanto says are obtained by using RR soybeans; the economic benefits identified in the "Marra study," discussed below, valued at $37.00 per acre; and Monsanto's cost of monitoring Roeder's compliance with the hypothetical agreement, which it estimates would average $16.00 per acre. Monitoring activities would include field sampling and testing. Taylor's figure for the cost of monitoring is based on estimates by Monsanto and is said to be necessary to help insure that growers, including licensed growers, abide by the license. Taylor would reimburse Monsanto for the cost under the benefits/risk capture model.

The seed cost savings calculation assumed that there were cleaning costs and opportunity costs associated with using saved seed, and took into account Roeder's legitimate purchases of seed. The increased yield benefit was based on Dr. Taylor's estimate, agreeing with Dion McBay, that for the three years at issue, farmers planting RR soybeans had increased yields of five to seven bushels more per acre compared to conventional soybean yields. The yield benefit was calculated by using the middle figure, six bushels per acre, multiplied by the Iowa average market price for each season.

What was referred to at trial as the "Marra study" is a document titled <u>The Net Benefits, Including Convenience, of</u>

Roundup Ready® Soybeans: Results from a National Survey.  The
authors, Michele C. Marra, Nicholas E. Piggott, and Gerald A.
Carlson, are faculty in the Department of Agricultural and
Resource Economics at North Carolina State University in Raleigh.
The article is available on the internet at the web site of the
National Science Foundation Center for Integrated Pest
Management, http://cipm.ncsu.edu/cipmpubs/marra_soybeans.pdf.[3]

     The Marra study, dated September 2004, used data from a
national telephone survey of soybean farmers conducted by Doane's
Market Research in early 2003.  The survey involved 610 farms,
525 from the Midwest and 85 from the South, that had planted at
least 250 acres of soybeans in 2002.  The average size of the
farms included in the survey was 994 acres of cropland.  Farmers
were asked about factors that influenced their decision whether
to use the RR soybean technology.  Actual cost savings were a
stated benefit.  The farmers were also asked to put a dollar
value on various non-pecuniary benefits of the technology.  These
included factors such as human and environmental safety benefits,
convenience, including time savings, and a negative value on
perceived disadvantages of the technology.  The Marra study
investigated why farmers chose to plant RR soybeans and to what
extent reduced tillage methods influenced the decision.  The
perceived net benefit of using RR soybeans, as estimated by

---

[3] On the title page of the article, the authors thank the
NSF Center for "funding the study through a member contribution
by Monsanto Company."

farmers in the study who planted RR soybeans on all their soybean acres and used reduced tillage methods, was about $37.00 per acre.  See Marra et al., above, at 20 & Table 17.

Early studies comparing RR soybean yields to conventional soybeans reported varied results.  Marra et al. at 7.  The Marra study observed that yield comparisons are complicated by a number of variables.  Id. at 14.  Comparing yields within the same farm, and thus eliminating certain variables, the study found no significant difference in yields of the survey participants for the 2001 and 2002 growing seasons.  Id. at 19.

Combining the four components of the benefits/risk capture approach, Monsanto calculated per-acre royalty damages as follows:

|                    | 2003     | 2004     | 2005    |
|--------------------|----------|----------|---------|
| Seed Cost Savings  | $14.74   | 13.68    | 10.21   |
| Yield Benefit      | 46.20    | 34.56    | 33.24   |
| Marra Benefits     | 37.00    | 37.00    | 37.00   |
| Monitoring Cost    | 16.00    | 16.00    | 16.00   |
| Totals             | $113.94  | $101.24  | $96.45  |

Doc. 76 at 13.  Monsanto then multiplied these figures by the number of soybean acres for each year:

```
2003    $113.94/acre  x  355 acres   =  $40,448.70
2004    $101.24/acre  x  143.1 acres  =  $14,487.44
2005     $96.45/acre  x  468.4 acres  =  $45,177.18

Total   $100,113.32 [4]
```

---

[4] Monsanto's calculations of the yearly totals do not agree with the court's, but its grand total differs by only $0.55.

15

Dr. Taylor described the exponential effect of planting and saving seed over a number of years.  He calculated that Roeder had produced enough seed in three years to plant tens of thousands of acres.  He said that the potential damage to Monsanto's market share from this exponential effect should be considered in determining a reasonable royalty.  Transfers, including sales of saved seed or the product of saved seed to others, would be a major concern to Monsanto.  However, there was no evidence of Roeder selling or providing saved seed to anyone.

Roeder reported farm income on Schedule F to Form 1040 as follows:

| Tax Year | Gross Income | Farm Expenses | Net |
|---|---|---|---|
| 2001 | $   468,335 | $   454,507 | $   13,828 |
| 2002 | 395,006 | 399,667 | (4,661) |
| 2003 | 575,567 | 560,461 | 15,106 |
| 2004 | 1,371,358 | 1,388,703 | (17,345) |
| 2005 | 1,692,393 | 1,840,167 | (147,774) |

Exhibits A-C, E, F.

On February 9, 2005, Roeder made a statement of his financial condition on an "Agricultural Balance Sheet," reporting a net worth of $653,826.00.  Exhibit 24.


## Discussion

Monsanto seeks a determination that Roeder's liability for patent infringement is a nondischargeable debt for willful and malicious injury within the meaning of 11 U.S.C. § 523(a)(6).  Monsanto asks the court to enter judgment for damages and attorney fees calculated pursuant to 35 U.S.C. §§ 284 and 285.

It also asks the court to impose against Roeder a permanent injunction under 35 U.S.C. § 283.  Monsanto bears the burden of proving all elements of its claim by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654 (1991); Jamrose v. D'Amato (In re D'Amato), 341 B.R. 1, 4 (B.A.P. 8th Cir. 2006).

The Eighth Circuit standard for proving malice in this case is set out in Barclays American/Business Credit, Inc. v. Long (In re Long), 774 F.2d 875 (8th Cir. 1985).  "[K]nowledge that legal rights are being violated is insufficient to establish malice, absent some additional aggravated circumstances."  Id. at 881.  The harm to Monsanto from infringement of its patent is limited to economic harm.  In order to show malice, Monsanto must show that Roeder's conduct was targeted at Monsanto, "at least in the sense that the conduct [was] certain or almost certain to cause financial harm."  Id.

## Malicious Injury

The court has previously found that Roeder's conduct was wilful.  The court concludes that Roeder's conduct was malicious. He knew not only that his use of RR soybeans was an infringement of Monsanto's patent but also that Monsanto was certain to suffer financial harm as a result of his conduct.  Roeder was a well-experienced farmer and had been a seed dealer for many years. This experience made him fully aware of critical features of the Monsanto RR soybean technology.  As a contract seed grower for

17

Remington, he was aware of restrictions on the use of Monsanto RR soybeans. As a seed dealer, he knew that certain documents were required for the purchase and planting of RR soybeans. He knew that farmers purchasing RR soybeans had a limited license to use the seed and that the license prohibited saving seed or planting saved seed.

Moreover, Roeder's experience as a seed dealer made him aware of the novel pricing structure for sales of RR soybeans. He was given specialized instruction as to how Monsanto collected a technology fee through the sale of each bag of seed. He knew that seed purchases required the payment of a technology fee, either as a separate line item or included in the price of each bag of seed, that was passed on to the farmer. By using saved seed he would gain the RR technology without paying the fee, and he knew that Monsanto would thereby suffer economic harm by not receiving the fee.

At trial, counsel for Monsanto asked Roeder if it were not true that his improper use of RR seed necessarily meant that Monsanto suffered a loss of the technology fee. Roeder said that he "never thought of it that way," and that he "didn't give that a thought." The court finds that Roeder's actions belie his testimony. He acquired the seed for planting his 2003 crop by stealing it from his son, and he kept this information from his son for some time. These circumstances create an inference that Roeder was knowingly causing financial injury to Monsanto.

The court also concludes that Roeder's partial purchases of

18

RR soybeans in 2004 and 2005 were part of an effort to conceal
the fact of his planting even larger amounts of saved seed.  If
saving crop expenses were Roeder's only motive, he could have
planted all of his acres with seeds saved from the previous
year's crop.  Roeder attempted to overcome the inference of
concealment, saying that in 2004 one of his customers returned
some seed that he, as the seed dealer, bought back.  The customer
was not a witness at trial.  Assuming that Exhibit 11 is a record
of an ordinary course transaction, it does not explain more than
a small portion of Roeder's seed purchases.

Roeder attempted to characterize his actions as merely an
unsuccessful effort to save his farming operation.  The debtor in
In re Long transferred proceeds of collateral in breach of the
agreement with the secured creditor.  The debtor in In re Long
explained that his purpose was to save his business, which would
ultimately benefit creditors.  In re Long, 774 F.2d at 882.  The
Eighth Circuit affirmed the lower courts' rulings that the
debtor's conduct was not malicious.  Roeder's patent infringement
is distinguishable from the debtor's conduct in In re Long.
Roeder's misuse of saved seed was not a last desperate act to
reduce expenses in order to save his farm operation.  He
maintained the infringing conduct for three crop years, and
during this period he expanded his grain operation by 268 acres.
There is no doubt that Roeder wanted to continue farming, but his
plan was to do so at Monsanto's expense.

Reasonable Royalty

Section 284 of the patent statute provides for the award of

damages:

> Upon finding for the claimant the court shall award
> the claimant damages adequate to compensate for the
> infringement, but in no event less than a reasonable
> royalty for the use made of the invention by the
> infringer, together with interest and costs as fixed by
> the court.

> When the damages are not found by a jury, the court
> shall assess them.  In either event the court may
> increase the damages up to three times the amount found
> or assessed.  Increased damages under this paragraph
> shall not apply to provisional rights under section
> 154(d) of this title.

> The court may receive expert testimony as an aid to
> the determination of damages or of what royalty would
> be reasonable under the circumstances.

35 U.S.C. § 284.

The court recognizes that some courts have adopted a

hypothetical negotiation methodology for calculating a reasonable

royalty.  See, e.g., Monsanto Co. v. Strickland, 604 F.Supp.2d

805, 816-17 (D. S.C. 2009).[5]  At least one court, however, has

found the methodology troubling.  Monsanto Co. v. Wood (In re

Wood), 309 B.R. 745, 755-56 (Bankr. W.D. Tenn. 2004).  This court

also has concerns about the hypothetical negotiation methodology,

which seems to depart from the purpose of using the approach.

The court in Georgia-Pacific referred to it as a "willing buyer

and willing seller" rule.  318 F.Supp. 1116, 1121.  In fixing

reasonable royalty damages--

---

[5]  Dr. Taylor was also the expert witness in Strickland.

> the sum allowed should be reasonable and that which
> would be accepted by a prudent licensee who wished to
> obtain a license but was not so compelled and a prudent
> patentee, who wished to grant a license but was not so
> compelled. . . .  The primary inquiry . . . is what the
> parties would have agreed upon, if both were reasonably
> trying to reach an agreement.

Id. at 1121 (citations omitted).  The inquiry takes numerous

factors into account.  Id.  Dr. Taylor suggested that Monsanto

would not enter into an agreement with an individual farmer on

any terms, because the practice would contradict its business

model.  It is also questionable whether Roeder would be a willing

party to any such agreement with Monsanto, if a negotiated

royalty would eliminate profit.  See Georgia-Pacific at 1122

("the very definition of a reasonable royalty assumes that, after

payment, 'the infringer will be left with a profit'").  In

determining a reasonable royalty, I will not apply the

hypothetical negotiation model.

   "An established royalty is usually the best measure of a

'reasonable' royalty for a given use of an invention because it

removes the need to guess at the terms to which parties would

hypothetically agree."  Monsanto Co. v. McFarling, 488 F.3d 973,

979 (Fed. Cir. 2007).  The technology fee included in the

purchase price of a bag of RR soybeans is not the "established

royalty" for RR soybeans.  A patent infringement defendant cannot

limit damages to the technology fee.  McFarling, 488 F.3d at 979-

80; Monsanto Co. v. Ralph, 382 F.3d 1374, 1383-84 (Fed. Cir.

2004).  The technology fee is, however, in the nature of a

royalty.  McFarling, 488 F.3d at 979; Strickland, 604 F.Supp.2d

at 815, 816 n.5; see also Exhibit 16 (technology agreement describing fee as "in part a Monsanto royalty").

In McFarling, the Federal Circuit stated that the full cost of a bag of RR soybean seed, including the technology fee, can be characterized as being in the nature of a royalty.  488 F.3d at 979-80.  Monsanto sells RR soybeans to farmers under a limited-use license, the technology agreement, that requires them to purchase seeds only from authorized distributors and to pay the technology fee.  "[T]he value to Monsanto of both performances provides one measure of the 'reasonable royalty'."  Id. at 979. Thus, the full cost of a bag of seed is a valid starting point for calculating a reasonable royalty.

A reasonable royalty as measured by the price that an authorized seed dealer would have charged Roeder for a bag of RR soybeans, including the technology fee, in each of the three years, multiplied by the number of bags that Roeder would have had to purchase in order to plant the number of soybean acres grown in the years at issue is shown as follows:

| 2003 | $26.04/bag | x | 302 bags | = | $ 7,864.08 |
| 2004 | $26.60/bag | x | 99 bags | = | $ 2,633.40 |
| 2005 | $26.60/bag | x | 239 bags | = | $ 6,357.40 |
| Total | | | | | $16,854.88 |

Enhanced damages are appropriate in this case.  Multiplying this sum by three would result in reasonable royalty damages of $50,564.64.

Monsanto argues that it would not be proper to limit its damage award to the technology fee that Roeder would have paid if

22

he had made legitimate purchases, in effect requiring him to pay only because he got caught. Monsanto urges the court to award reasonable royalty damages of approximately $100,113.00, using the four components of the benefits/risk capture approach discussed above, and to treble the damages for a total damage award of approximately $300,340.00.

Even with enhanced damages, I consider that the method of calculation based on the cost of each bag of seed is insufficient to determine a reasonable royalty. I will adopt, with modifications, Monsanto's alternate theory of calculation, the benefits/risk capture.

The modification will be to eliminate the Marra economic benefits per acre for no-till soybean acres. Marra calculates the economic benefits to be $37.00 per acre. Table 17 of the Marra article provides the following pecuniary and non-pecuniary economic benefits information for full adopters of the RR soybean seed system in 2001. Negative numbers are net costs of the RR system over traditional soybean systems, and positive numbers are net benefits.

| Difference in: | $ Per Acre | No. of Study Observations |
|---|---|---|
| 1. Seed Costs | -9.01 | 214 |
| 2. Herbicide Product Cost | 8.68 | 190 |
| 3. Application Cost | 1.40 | 170 |
| 4. Harvest Cost | -0.47 | 175 |
| 4. (sic)Operator & Worker Safety Benefit | 3.16 | 187 |
| 5. Environmental Benefit | 3.19 | 181 |
| 6. Total Convenience Benefit | 7.54 | 188 |
| 7. Saved Seed Restriction and Market Uncertainty of Biotech | -3.77 | 229 |
| RR Soybeans Net Benefits Sub-Total Without Reduced Tilling Benefits | $10.72 | |
| 8. Tillage Cost (Worker and Equipment Cost) | -0.72 | 221 |
| 9. Reduced Tillage Time Saved | 10.86 | 211 |
| 10. Reduced Tillage Environmental Benefit | 8.87 | 154 |
| 11. Other Convenience Benefits of Reduced Tillage | 7.64 | 154 |
| 12. Yield Difference | Not statistically significant | Not Reported |
| Net Benefits Including Reduced Tillage Benefits | $37.37 | |

Marra, at 37.

Few of the 12 categories of economic benefits are provided in actual dollar costs. The Introduction of the article states in part:

> Roundup Ready ® (RR) soybeans account for over 80% of U.S. soybean acreage (USDA, NASS, 2004). Many farmers are planting 100% of their soybean acreage to RR soybeans and plan to continue doing so. RR soybean adoption is still increasing even though prices of herbicides commonly used on conventional soybeans have fallen to the point that, when only monetary costs and returns are considered, conventional soybean systems are competitive with RR soybean systems.
>
> Why then are the RR soybeans so widely used? What features of the technology cause farmers to rapidly adopt them? When asked why, many farmers answer that the RR soybean system is more "convenient," "simpler," or "safer" than a conventional system. These types of replies raise the question of whether non-traded, or non-pecuniary, aspects of the RR soybean production system impact farmers' choices. Accordingly, this

study examines and quantifies these non-pecuniary
aspects of the RR soybean production system.

Id. at 3.

The study asked "farmers for their monetary estimates of the
value of the relative labor and machinery time savings and other
convenience factors from use of RR soybeans on their farm." Id.
at 8. An objective of the study was to "assess the role of non-
pecuniary factors in the use of RR soybeans and conservation
tillage in the United States." Id. at 9.

Despite Dr. Taylor's reliance on the study, including its
"net economic benefits" estimate as a component of a reasonable
royalty under the benefits/risk capture calculation, I find that
the non-pecuniary benefits identified in the study are far too
subjective to use as a basis for damages. The pecuniary benefit
and cost items (numbers 1, 2, 3, first 4, 8) essentially add up
to net zero (-0.12). The non-pecuniary factors add up to $37.49,
for net economic benefits of $37.37. I do not think the
subjective view of another farmer as to the value of an
environmental benefit, or the savings in his management time, or
the value of enhanced safety is an appropriate yardstick for
determining reasonable royalty damages in this case. For this
reason I will eliminate the Marra economic benefits of $37.00
from Dr. Taylor's calculation.

I accept the balance of his testimony as to the alternative
benefit/risk capture model. The chart used by Monsanto in
summarizing the reasonable royalty as modified by the exclusion

of the Marra factors, is as follows:

Reasonable Royalty Calculation Converted to a Per Acre Basis

|  | Year 2003 | Year 2004 | Year 2005 | Grand Total |
|---|---|---|---|---|
| Soybean Acres | 355 | 143.1 | 468.4 | |
| Seeding Rate (lbs. per acre) | 42.5 | 42.5 | 42.5 | |
| Market Price | $ 7.70 | $ 5.76 | $ 5.54 | |
| | | | | |
| Cost of RR Seed per Acre | $22.13 | $22.61 | $22.61 | |
| Roeder Cost of Seed per Acre | $ 7.40 | $ 8.93 | $12.40 | |
| Seed Cost Savings per Acre | $14.74 | $13.68 | $10.21 | |
| | | | | |
| Value of Increased Yield @ 6 bushels per Acre Yield Increase | $46.20 | $34.56 | $33.24 | |
| | | | | |
| Subtotal of Seed Saving and Yield Increase Benefits | $60.94 | $48.24 | $43.45 | |
| | | | | |
| Monitoring Cost per Acre | $16.00 | $16.00 | $16.00 | |
| | | | | |
| Total Monitoring Cost and Benefits (per Acre) | $76.94 | $64.24 | $59.45 | |
| | | | | |
| | X 355 | X 143.1 | X 468.4 = | |
| | | | | |
| Total Cost and Benefits | $27,313.70 | $9,192.74 | $27,846.38 | $64,352.82 |

Brief, doc. 76 at 13 (footnotes omitted).

I find that a reasonable royalty to be awarded as damages to Monsanto for Roeder's three years of infringement is $64,352.82. I find and conclude that enhanced damages are appropriate in this case. Given the totality of the circumstances I will double this amount, thus awarding damages of $128,705.64. The enhancement is based on Roeder's wilful and malicious infringement over a three-year period, his initial wrongful taking of his son's RR seed, and his concealment of his activity. Moreover, I find his former status as a seed salesman to be an additional factor, as he both understood the sale and licensing requirements of the RR soybean technology, and he benefitted from them as a sales

representative.   However, Roeder's conduct might have been found

much more egregious had there been evidence that he sold or

transferred saved seed, thereby competing with Monsanto on

distribution to others.   There was not.


                              Attorney Fees

     "The court in exceptional cases may award reasonable

attorney fees to the prevailing party."   35 U.S.C. § 285.

Monsanto asks the court to determine that this is an "exceptional

case" within the meaning of § 285, and to award attorney fees.

Counsel for Monsanto has submitted as Exhibit 23 a summary of and

itemizations of fees and expenses incurred through April 30,

2009.[6]  Fees for the period included in the summary totaled

$164,455.50 and expenses totaled $19,474.57.   This was for the

period from early 2008 through April 30, 2009, a month before

trial.   By a letter to the court dated December 9, 2009, Monsanto

waived its claim for attorneys' fees incurred after April 30,

2009.

     Awarding attorney fees for patent infringement is a two-step

process.   First, the court must make the factual determination

that a case is exceptional, and then the court must decide in its

discretion whether to award attorney fees.   Perricone v. Medicis

Pharmaceutical Corp., 432 F.3d 1368, 1380-81 (Fed. Cir. 2005);

---

     [6] The same summary and itemizations have been docketed (doc.
92).   Exhibit 23 and docket no. 92 have been sealed by order of
the court based on Monsanto's motion and defendant's agreement.

<u>Monsanto Co. v. Strickland</u>, 604 F.Supp.2d at 818.  Courts have found cases exceptional based on the defendant's infringement conduct, his litigation conduct, or both.  <u>See</u>, <u>e.g.</u>, <u>Siebring v. Hansen</u>, 346 F.2d 474, 480 (8th Cir. 1965) (after consent decree and writ of injunction issued, defendant continued to infringe patent and challenge validity of patent); <u>Monsanto Co. v. Strickland</u>, 604 F.Supp.2d at 818 (case was exceptional because of willful infringement and litigation misconduct); <u>Monsanto Co. v. Trantham (In re Trantham)</u>, 304 B.R. 298, 303 (B.A.P. 6th Cir. 2004) (infringement conduct, including concealment, made award of attorney fees appropriate).

This court finds that Roeder's case is exceptional, warranting an award of attorney fees.  Roeder knowingly infringed Monsanto's patent on RR soybeans over a period of three crop years.  As a seed dealer, he was well aware of the requirements for purchasing RR soybean seed and the prohibitions on saving seed.  Further, he was given specialized instruction as to how Monsanto collected its technology fee.  He knew that saving seed would cause Monsanto economic damages.  He obtained seed for his 2003 crop by an unauthorized taking from his son and keeping this fact secret until much later.  He attempted to conceal his patent infringement by making some legitimate purchases of seed.

Although the court finds this an "exceptional case" for the purpose of awarding attorney fees, certain factors make it inappropriate to award all the fees requested.

For the period January 8, 2007 through April 30, 2009,

Monsanto's attorneys, Frilot, LLC (hereinafter "Frilot") billed Monsanto $164,455.50 for legal services and $19,474.57 for costs. Four attorneys and three paralegal personnel worked on the proceeding.  The charges for each were as follows:

| Lawyer (L) or Paralegal (P) | Hourly Rate | Hours | Total Charge |
|---|---|---|---|
| Miles P. Clements (L) | $275 | 24.90 | $ 6,847.50 |
| Michael H. Pinkerton (L) | 195 | 2.40 | 468.00 |
| Joel E. Cape (L) | 165 | 466.30 | 76,939.50 |
| Garrett W. Thalgott (L) | 135 | 572.70 | 77,314.50 |
| Lawyer Hours | | 1,066.30 | $161,569.50 |
| | | | |
| Peter J. Lampard (P) | 75 | 36.80 | 2,760.00 |
| Mary E. Rowland (P) | 75 | 1.20 | 90.00 |
| Suzanne L. Wilson (P) | 90 | .40 | 36.00 |
| Paralegal Hours | | 38.40 | 2,886.00 |
| | | | |
| Total Hours | | 1,104.70 | $164,455.50 |

The costs totaling $19,474.57 comprised legal fees for local counsel in the amount of $5,200.16, fees for experts in the amount of $4,387.50, and miscellaneous costs of $9,886.91.

Notwithstanding the time invested, the facts of this case were not particularly complex.  The trial, which was completed in one day, was a bench trial against one defendant.  A prior motion for summary judgment resulted in an order establishing liability and willfulness.  Trial was limited to the issues of malice and damages.  Three attorneys and a paralegal traveled to Sioux City on behalf of Monsanto for trial; local counsel also made an appearance.  The major events of the case included the filing of the complaint, a telephonic scheduling conference, the filing of an amended complaint and a joint pre-trial statement, discovery, the filing of Monsanto's motion for summary judgment with related

briefs and hearing, trial, and post-trial briefing.  The
itemization of attorney time filed by Frilot showed numerous
discussions among counsel, the review and organization of
documents.  From my review of the itemization, the number of
counsel involved resulted in some duplication of effort.  From my
review of relevant case decisions, it appeared that the Roeder
proceeding was not Frilot's first experience with this specific
type of litigation.  See Monsanto Co. v. Trantham, 304 B.R. 298,
300 (B.A.P. 6th Cir. 2004); Monsanto Co. v. Wood, 309 B.R. 745,
746 (Bankr. W.D. Tenn. 2004).  I determine that the time expended
on this case was not justified by its complexity or the nature of
the disputes.  There was no evidence of litigation misconduct by
Roeder.  While Monsanto is certainly justified in pursuing a
farmer who has infringed its patents on seed, it is not
reasonable to penalize the defendant on the theory that the
patent statute allows plaintiff to recover all attorney fees it
incurs, without restraint.

Monsanto's own calculation of damages was $100,113.32
(supra, p. 15).  Fees and costs should not exceed that amount.  I
will award Monsanto $82,227.75 in legal fees and $19,474.57 in
costs which includes local counsel's fees in the amount of
$5,200.16.  The total award of fees and costs is $101,702.32.


## Injunction

Monsanto stated in its pretrial statement that it would seek
a permanent injunction pursuant to 35 U.S.C. § 283.  That statute

provides as follows:

> The several courts having jurisdiction of cases under
> this title may grant injunctions in accordance with the
> principles of equity to prevent the violation of any
> right secured by patent, on such terms as the court
> deems reasonable.

In its post-trial brief, Monsanto argued that the court should permanently enjoin Roeder from "purchasing or using any crop seed containing Monsanto's patent seed technologies." (Doc. 76 at 17.) Monsanto has not shown that such an injunction, which would seem to prohibit noninfringing conduct, is necessary. <u>See Monsanto Co. v. McFarling</u>, 488 F.3d at 981-82 (declining to modify injunction, which did not compel Monsanto to license technology to defendant).

IT IS ORDERED that Monsanto shall recover from Ronald Roeder the sum of $230,407.96, which debt is excepted from his discharge pursuant to 11 U.S.C. § 523(a)(6). Judgment shall enter accordingly.

DATED AND ENTERED <u>December 14, 2009</u>

William L. Edmonds, Bankruptcy Judge